(C. D. 1617)

HAROLD M. GELLER *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 26, 1954)

*Theodore Schulman* (*Jerome Friedman* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Richard M. Kozinn* and *Samuel D. Spector*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Merchandise, described as "1000 Davenset High Discharge Battery Testers, type M. I. Black," was classified by the collector of customs in paragraph 368 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 368 (a)), as modified by the trade agreement between the United States and Switzerland, 69 Treas. Dec. 74, T. D. 48093, as devices intended or suitable for measuring the flowage of electricity, and duty was assessed thereon at the rate of 75 cents each and 32½ per centum ad valorem.

Plaintiff claims that the merchandise should be classified as articles having as an essential feature an electrical element or device and subjected to duty at the rate of 15 per centum ad valorem as provided in paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The provisions of law, so far as applicable here, read as follows:
Paragraph 368 (a) of the Tariff Act of 1930, as modified, *supra*:

* * * mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity; * * *;

\* \* \* \* \* \* \*

Valued at more than $2.25 but not more than $5 each_____ 75¢ each.

\* \* \* \* \* \* \*

(2) Any of the foregoing shall be subject to an additional duty of_____ 32½% ad val.

Paragraph 353 of said act, as modified, *supra*:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices),

finished or unfinished, wholly or in chief value of metal, and not specially provided for:

* * * * * * *

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines)_____15% ad val.

The primary question for our determination is whether or not the battery testers in controversy are instruments or devices intended or suitable for measuring the flowage of electricity. It seems not to be disputed that they are "articles having as an essential feature an electrical element or device." However, for reasons which will be disclosed *infra*, they cannot be classified in paragraph 353, *supra*, if they meet the call of paragraph 368, *supra*, for it has been held that the provision in paragraph 368 (a), with which we are here concerned, is more specific than the provision in paragraph 353, relied upon by plaintiff. *Carnegie Institute of Technology* v. *United States*, 67 Treas. Dec. 310, T. D. 47542.

At the trial, two witnesses were called, both of whom testified on behalf of the plaintiff.

Donald J. Mackintosh testified that he was secretary of the Commercial Oil Corp., with which he had been employed since 1948; that he was familiar with the battery testers here in controversy and produced a sample illustrating the testers, which was received in evidence as exhibit 1.

The second witness, Philip Cane, testified that he was a graduate electrical engineer, had been engaged either as an instructor or in practical electrical engineering for about 20 years, and was shown to be well qualified as an expert in the electrical trades. He testified to his familiarity with the merchandise represented by exhibit 1 which he stated "is designed to test storage batteries of the type that are used in automobiles; passenger automobiles and similar vehicles" and that it is not intended for measuring the flowage of electricity. Upon this phase of the case, the witness testified— .

This instrument has on its face a scale mark [sic] volts and another scale marked amperes. Both of these units are units of measure and therefore, it would seem that that is the purpose of this; however, that is only one phase of this device. This device is designed to test—that is, to ascertain the true nature as far as possible of a storage battery. It could not be used simply as a voltmeter or as an ammeter. The reason for that is as a voltmeter, it would be very very insesetive [sic]; it would do an inadequate, very inadequate job and therefore, could not be used at all without the destroying force—destroying the source which it intended to measure. In measuring instruments, there is always the attempt to avoid deforming the source as much as possible whereas this instrument takes the opposite view entirely and attempts to deform the source, to place it under stress so that you will [?] be able to get an indication of the true state of the storage battery. In addition to this meter-like instrument, it has a resistance coil hidden behind this perforated metal screen. That too is designed for momentary purposes as indicated on the back because if you attempted to use this instrument to measure

any source, why it would tend to overheat and would destroy the instrument as well as the source.

In the opinion of the witness, it would be "absolutely impossible" to measure the flowage of electricity with this device. To quote further—

* * * From a mechanical aspect, every electrical instrument must have some medium of connecting into a circuit. Now, there are various methods. Most of them—all that I have seen—revolve in having screw type or spring type terminals so that you can make a connection into the electrical circuit. This has no such device and therefore would be most inconvenient and non-commercial for that purpose. You could, of course, wrap a piece of wire around. You can deform the use or deform the object of any instrument by doing something to it. If it were to be used as an ammeter and measure the scale 200 amperes as it says here, according to the New York Code, 200 ampere current must be carried by a wire approximately ⅜ in diameter. That would be somewhere around the size of my pinkie, I guess. So, wrapping a copper wire around this would be very impractical. Nobody would purchase such an instrument, such a device for that purpose.

When asked to explain the difference between exhibit 1 and an instrument to measure the flowage of electricity, the witness gave the following explanation:

An instrument to measure the flowage of electricity from a physical point of view will have a screw type or spring type terminal so that ready connections can be made into the circuit. From an electrical point of view, they must not change the circuit at all, if possible. That is impossible; therefore, they are designed simply to change the circuit a minimum amount. An average volt meter will have a minimum sensitivity of approximately 100 ohms per volt. A really good volt meter——

JUDGE FORD: What, exactly, do you mean by a change of circuit?

THE WITNESS: Well, if I may use a parallel, simply this: If you are going to measure let's say the temperature of water and that temperature of water is, let's say 200 degrees, you wouldn't want to use a thermometer which when put into the water would cool that water below its 200 degrees, nor would you want to use an instrument which would elevate that temperature. In other words, you wouldn't take a thermometer, put it in a refrigerator and put it in warm water because the instrument itself would tend to change the thing that you are trying to measure. Now, in electricity, a meter is a circuit element. Every circuit element will tend to change the circuit somewhat but you want to try to change it as little as possible. As soon as your instrument changes the circuit a great deal, then you have no measuring instrument. In this case, it is designed definitely to change the circuit a great deal.

JUDGE LAWRENCE: You are referring now to Exhibit 1?

THE WITNESS: Yes.

On cross-examination, the witness testified in substance that exhibit 1 is purposely made to test each cell of a battery under a simulated load, and that "Exhibit 1 provides the simulated load"; that a galvanometer "is a sensitive electrical instrument for the measurement of the flow of electric—flow of electrons. * * * The flow of electrons constitutes what we commonly call current" which is measured in terms of amperes; that the meter in exhibit 1 might be termed a voltmeter, if it were detached from the rest of the equipment,

and, by the same token, it could be considered an ammeter, although it would be necessary to change the scale—"In other words, you could not use it exactly as it is. * * * Because as soon as you remove this portion, you are changing the resistance portion; you are going to change the characteristics of the instrument and therefore, the scale no longer holds." The witness reiterated that while an ammeter and a voltmeter might be suitable for measuring the flowage of electricity, it was his opinion that exhibit 1, as a unit, was not intended for that purpose.

Cane admitted that exhibit 1 would indicate the flowage and amperage "Under a cell of imposed load"; that when the prongs of exhibit 1 are placed on the terminals, there is a flowage of current which goes through the concealed resistor. He explained that the battery generates or converts chemical energy into electrical energy; that there is a flowage through the battery as well as a flowage wherever it is being charged, and, when it is being discharged, there would be a flowage out of the battery; that when a battery is in operation, there is a flow of electricity from the battery to the ignition system and "your horns and your radio and your heater and your lights and from the generator of the battery at such times as your battery may have been low; may have been discharged previously."

When asked if exhibit 1 demonstrates the flowage of electricity from the battery to any of the parts above mentioned, the witness replied that it does not, it tests the electrical power in the battery; that the flowage of electricity over a wire "would be the number of electrons passing a given point in a given time" but that it would not be commercially practical to use exhibit 1 for that purpose; that ordinarily an ammeter would be used. "The whole physical make-up of the item is such as to make it inconvenient and inaccurate for that purpose."

On cross-examination, witness Cane testified in substance that, in determining the strength of a battery with the use of exhibit 1, current flows from one terminal to another when the instrument is properly applied to the battery; that the pressure behind the current is the flowage; and that, when a continuous circuit is created with the use of exhibit 1, a flowage of current passes partially through the meter which measures the flow.

It is of interest to note that a metal plate fastened to the underside of exhibit 1 bears the following printed matter containing instructions for the use of the commodity:

(1) Press points firmly across each separate cell for 5 seconds.

(2) With lead acid batteries, a steady reading of 100 amps. for standard car-starter batteries or 140 amps. approx. for heavy duty traction cells indicate a good cell.

(3) When testing alkaline cells of medium capacity a steady reading of 70 amps. should be obtained.

(4) If needle falls slowly to zero the cell is discharged or defective.

Plaintiff stoutly maintains that the subject battery tester is not a device or instrument designed or suitable for measuring the flowage of electricity, notwithstanding the fact that in its fabrication the article is equipped with an ammeter and a voltmeter, both of which are vital and essential adjuncts of the device, and are recognized as meters commonly used to measure the flowage of electricity. Since they measure the flow of electric current in the process of testing a battery, a person is enabled to determine the strength of a battery.

Defendant relies upon our decision in *Ferranti, Ltd.* v. *United States,* 69 Treas. Dec. 609, T. D. 48242. We there held that certain ammeters and voltmeters, which indicate the number of amperes and the number of volts, respectively, in an electric current, were devices which indicate or measure two phases or elements which must be determined in measuring the flowage of electricity. The claim of plaintiff in that case that the only instrument which measures the flowage of electricity is the wattmeter was rejected by the court, citing *Carnegie Institute of Technology, supra.*

In the *Carnegie* case, a device known as a galvanometer was held to be properly dutiable as an instrument intended or suitable for measuring the flowage of electricity, since its function was to measure the electric current in microamperes that flows through the coil. The claims in that case that the galvanometer was an electrical instrument within the meaning of paragraph 353 of the Tariff Act of 1930 or as a laboratory instrument in paragraph 360 of that act were denied upon the ground that those provisions were less specific than the provision for "any * * * instrument intended or suitable for measuring * * * the flowage of * * * electricity" in paragraph 368 of said tariff act.

Reverting again to the *Ferranti* case, it appears that, with regard to the classification of ammeters and voltmeters, this court took occasion to explore the congressional history of paragraph 368, *supra,* in its relation to paragraph 353, and stated in part as follows:

At the hearing held before the Committee on Finance of the United States Senate upon H. R. 2667 (Seventy-First Congress, First Session), which ultimately became the Tariff Act of 1930, Herbert Nehls, vice president of a corporation engaged in importing electric meters of all kinds, including such as are used in electrical central and distributing stations, urged before the committee that all such meters should be taken from paragraph 368, where they had been placed by the House of Representatives, and placed in paragraph 353, the new electrical paragraph. * * *

The court then cited at some length extracts from the testimony of Mr. Nehls (Hearings, Committee on Finance, United States Senate, Seventy-First Congress, on H. R. 2667, pages 785 to 796), and gave expression to the following views:

Hence, from the testimony of the importers and from the questions and answers and statements of members of the Senate Finance Committee, it seems apparent

that both the importers and the members of the committee understood thoroughly that all kinds of electrical measuring instruments had been included by the House of Representatives in H. R. 2667. In spite of the request of the importers, the Senate Finance Committee refused to take from.paragraph 368 and to include in paragraph 353 electrical measuring instruments *of any kind whatsoever*. [Emphasis added.]

The claim of plaintiff in the *Ferranti* case that the ammeters and voltmeters were properly dutiable in paragraph 353 was disposed of with the statement that—

\* \* \* They do not, however, specify what particular part of said paragraph [353] is relied upon, but it is manifest that said articles may not very well be included within the first two clauses of said paragraph. If classifiable at all under the paragraph it must be under the third and final clause of said paragraph, which reads:

> articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs.

The articles before us are measuring instruments, and none of the illustrative articles mentioned in said third clause of said paragraph 353 has the slightest similarity to any kind of a measuring instrument.

The determination of the issue here presented would seem to be controlled, contra to plaintiff's claim for classification within the provisions of paragraph 353, as modified, *supra*, by the expression in the *Ferranti* case, *supra*, to the effect that paragraph 368 was intended to cover electrical measuring instruments "of any kind whatsoever." Moreover, in passing, it is worthy of note that in the *Carnegie* case, *supra*, the court there was of the opinion that the provisions of paragraph 353 and paragraph 360 of the Tariff Act of 1930 were less specific than the provision for "any \* \* \* instrument intended or suitable for measuring \* \* \* the flowage of \* \* \* electricity" in paragraph 368 of said tariff act.

Upon the record before us and the cases referred to, *supra*, we find and hold that the subject battery testers are devices intended or suitable for measuring the flowage of electricity within the meaning of paragraph 368 (a), as modified, *supra*, as classified by the collector of customs. The claim of plaintiff is, therefore, overruled.

Judgment will issue accordingly.